The contract is in page 69. Consolidated Rail Corporation has offered to claim Grand Trunk Western Railroad for a range of 186 units. Provide that the location for the appellate. May it please the court, Jim Lozier appearing on behalf of the appellate Grand Trunk Western in this case. I would have requested that I reserve three minutes for rebuttal in this matter. You may please proceed. Thank you, sir. I want to address two points to emphasize why Grand Trunk believes that the September 12, 2012 judgment should be reversed by this court and that the court remand it back with an instruction to the district court the judgment be entered in favor of Grand Trunk. Before doing so and getting to those two points, I would point out to the court that the appeal in this matter and the actual resolution of the dispute involves three or interpretations of three documents. The first being the May 1, 1996 trackage right agreement which was entered into by Conrail and Grand Trunk. And the second document being the Surface Transportation Board's decision 89 which approved the joint acquisition by Norfolk Southern and by CSX of Conrail including Conrail the corporation itself and then the divvying up, if you would, of the assets of Conrail in addition to that. And finally, a third document, that third document being a shared asset area operation agreement for the Detroit area which was entered into in 1999 by CSX, Norfolk Southern and Conrail and which was approximately a year after the Surface Transportation Board's decision 89. Taking that into account, the two points I want to emphasize are first, why the STB's decision 89 and the shared asset operations agreement when taken as a whole did not result in CSX and Norfolk Southern having their own independent right to claim damages under the May 1, 1996 trackage rights agreement between Conrail and GTW and for which neither Norfolk Southern or CSX was ever a party. And then second, why the trackage rights agreement when taken as a whole reflects that Conrail and GTW intended the reference to Trenton Steel Warehouse or its successor to mean the 300,000 square foot warehouse itself or the owner of that building which was Huron Valley Steel and not any 85 acre landmass or geographical area as claimed by Norfolk Southern and CSX. Because Trenton Steel Warehouse or its successor doesn't reflect an 85 acre landmass, Conrail didn't have the right under the TRA to service anyone other than HBS or the warehouse itself. In the court's February, that is the district court's February 16, 2012 order, an opinion denying Grand Trunk's motion for entry of summary judgment dismissing Norfolk Southern as a party in this litigation, to dismiss I should say Norfolk Southern as a party to this litigation. The court didn't properly consider and construe from our perspective Decision 89 and the Detroit Shared Asset Area Operations Agreement. Let me ask you about that because I'm really not sure where you're going here. Sorry. There are a number of references that one could look at in the Decision 89 agreement. But the one that at least seems persuasive to me is the language and I'm looking for exactly where this appears. It says CSXT and NSR shall have the right to use, operate, perform and enjoy such assets to the same extent as CRC itself could. That seems to me that they've taken this up and they've said that whatever contracts exist are to be enjoyed by these other two acquiring companies as if they were their own contracts. In essence, your honor, that's the same conclusion that was reached by Judge Edmonds, but we would suggest to the court that when you read it. I'm asking you why was she wrong in concluding that's what this language means? Because she didn't take into account and apply the other language relating to shared assets and fixed assets in the sense of the limitations that were imposed. If you look at the paragraphs that relate to that subject matter, they start out with except as otherwise specified in this agreement. That's one of them. The second one is subject to the governing agreements. And finally, subject to the shared asset agreement. And if you look at it, I think that the judge missed the point in the sense that what you have here from an overall transaction is that you have allocated assets. And those allocated assets are the actual ones that are being divided up between CSX and Norfolk Southern. And those would naturally attach to them whatever rights Conrail would have at that point in time. And with respect to... So she'd be correct if it was in that category? It was in that category. She would be correct if it was in that category? Correct. You're saying this was not? This was not. It was in the retained assets portion which relates to these shared asset areas. There were three of them. Detroit was one of them. Philadelphia was another. New Jersey was another. Those agreements were drafted and, in fact, entered into subsequent to Decision 89. And even though Decision 89 may on the face of it had given the rights to potentially, as the judge indicated, be in the steps of Conrail, when you had this other agreement that was drafted, contrary to what they were given under 89, the two railroads turned around and said, one, and there are four or five provisions, but they said, one, that Conrail is going to continue on being an independent corporation. Two, that Conrail is supposed to own and continue owning their assets. Three, that they're supposed to continue, the board is, to manage them. Four, that Conrail is going to serve as a switching or a yard service agent for Norfolk Southern and CSX. And finally, What's your best portion of the 1997 agreement that you would have us look at to indicate that what Decision 89 seems to say is not true, in fact? Or is it a series of paragraphs? It's a series, as we outlined in our brief, Judge. I can't look at one. I don't think it's one. I think that it's reinforced by all of those qualifications throughout. And it's set forth. I can give you, I will give you one, and I do have one that I would point to. Okay. Give me your best one. If you could bear with me just for a second. Here it is. If you look at the court's order on page 5, the court partially quoted and did not include the entirety of Decision 89 at pages 398 and 399 of that determination. And that part states, quote, CSXT and NSR shall have the right to operate and use the allocated assets allocated to each of them and the shared assets including those presently operated by CRC under the trackage rights or leases. And then the part that the judge excluded and the part that we perceived is critically important is the language of subject to the terms of the allocated assets operating agreements, the shared assets areas operating agreements, which Detroit falls in in this particular agreement of May 1, 1996, would fall within the shared assets area, and other ancillary agreements as fully as CRC itself has possessed the right to use them, notwithstanding any provision in any law, agreement, order, document, or otherwise purporting to limit or prohibit CRC's unilateral assignment of its operating rights to another person or persons or purporting to affect those rights in the case of a change in control. There are two things that are derived out of that. One, again, I think it's the limitation that we talked about before, which is reemphasized if you go through and you see our brief with all the different paragraphs where there are qualifications and limitations. And then that gets you into looking at what's contained in the Detroit area shared asset agreement. And then, finally, the other thing that's very important here is that this paragraph effectively indicates that any anti-assignment paragraph or provision in a contract, in this case the May 1, 1996 trackage rights agreement, is in fact eliminated. It's no longer valid. That doesn't mean that automatically the assignment occurs. For the assignment to occur, you have to have an assignment in agreement. And they never had the agreement. They just, and let me back up also, I think that's the reason why they never brought a lawsuit initially, that is Norfolk Southern, for breach of contract of the TRA. When they started out, that for three years we had this case pending, they never had a claim for breach of the TRA by Norfolk Southern. Then suddenly, after the court eliminates and grants summary judgment in our favor to get rid of all the other claims, they suddenly bring this breach of contract claim two weeks before trial or three weeks before trial. I'm a little curious that you started with this and that you're spending almost all of your time on this. I'm sorry? No, don't be sorry. I'm just trying to divine why you're doing it. And I'm guessing that even if you lose on everything else, if the two individuals that got damages weren't entitled to damages, then you don't owe anything. I mean, is that basically why you're starting? Well, that's part of it. There is the other part to it, and I wanted to get into that, and that being from our perspective. But if you win on this, even if you lose everything else, you don't lose any money, right? The money, but the bigger, the more important aspect of this whole thing is really the precedent for the future in terms of not just this trackage right agreement. I think the court has to appreciate that. Not just this trackage right. So if what's going on in the future is the most important, you only got one minute left. Well, thank you, Judge. No, I appreciate that. And in terms of that, I would say to the court that with respect to the ability to enforce this agreement from Norfolk Southern's standpoint or from the standpoint of CSX, that first off, they don't have standing to do that. And secondly, putting that aside, in terms of the actual agreement itself, that agreement does not, in the future, allow for NS or CSX to preclude our client or prohibit our client from proceeding forward. Well, Conrail certainly does. And Conrail is that part of the case. They have standing. They have standing, and looking at the Conrail, they still don't. Oops, I'm sorry. They're the one that you say is the proper party here. Exactly. So if we're looking at the declaratory judgment on an ongoing basis, if that's what's most important to you, we don't have a problem with standing. It's just a question of whether the judge was right. Right. Okay. My time's out, but I will respond to that, Your Honor, when I come back. Thank you. Good morning, Your Honors. Larry Sheikman, appearing on behalf of Conrail, CSX, and Norfolk Southern. Well, where does the shared asset agreement give the right? Okay. Section 3 of the shared asset agreement clearly provides that Conrail has the right to provide switching services. But if you go back and look at the STB order at pages 33, 168, and 169, it makes it 100% clear that the economic relationship between the customers that were formerly served by Conrail is now transferred from Conrail to CSX and Norfolk Southern, as the case may be. So if you take Grant Trunk's heavy reliance on the Exxon Nuclear, the TVA case, that has really nothing to do with this, because in that case what was happening is the Exxon was trying basically to enhance the damages that were available to it. In this case, there's no enhancement of damages. All that we have is a reallocation of the same damages that otherwise would have been recoverable by Conrail, but for this transaction. But how do you, I mean, to say it's just a reallocation, that's fine, but didn't the judge find that Conrail failed to prove its damages? No, the judge before trial said that Conrail basically had no damages, but exercised her discretion. So if the party that clearly has the right to seek damages didn't have any damages, then why can you say so glibly that, well, we're just reallocating and these other guys maybe had damages? Because this was a transaction that was approved by the Surface Transportation Board. Decision 89 clearly gave Norfolk Southern and CSX the economic interest in the relationships with the customers that Conrail previously had had. That's what the order says. Mr. Lowe, is your right that when you read the 1997 agreement in its entirety, they essentially undid or didn't take advantage of what otherwise might have been in your favor in decision 89? That's not correct. What the so-called implementing the Shared Asset Area Operating Agreement did was merely for the convenience of the parties, allocate the physical operating responsibility for various train movements. But that agreement makes it clear, that is the Shared Asset Agreement for a shorthand, makes it clear that the economic relationship remains between CSX, Norfolk Southern on the one hand, and the customer on the other. The decision basically allocated certain assets to the two purchases and then some of it to a shared area, right? Correct. If you were to read the entire STB decision, here's what it basically says. Conrail is this giant railroad. We're going to divide it up into three piles. One pile goes to CSX. The second pile, and I'm oversimplifying because it was much more complicated from a tax and other point of view. But one pile goes to CSX. One pile goes to Norfolk Southern. The third pile, we really can't figure out what we're going to do with it. We're going to leave it in Conrail's hands. Then the parties said, okay, how are we going to go about allocating operating responsibility? But let's agree that we're talking about the part that was left in Conrail's hands. That's correct. This part in the Detroit area in the vicinity of Trent. So now we have to look to the SSA, right, or the SAA? We have to look at both the STB's order and the shared asset agreement in order to understand what's going on here. You can't just look at one without the other. Because tomorrow, Norfolk Southern and CSX could amend the shared asset agreement and say, okay, we're going to get rid of the opportunity for Conrail to operate at all. We're going to have Norfolk Southern and CSX provide the operations. And that would be, Grant Trunk couldn't say anything about it because part of the language that my adversary didn't emphasize says that Norfolk Southern and CSX shall have the right to use the allocated assets and the shared assets. So NS and CSX have the right to use the shared assets. But the impression, at least, does exist here that you are asking us to ignore the corporate niceties of what was going on here in a way that's almost saying you've got a, this may be an imperfect analogy, but you have a parent and a subsidiary, and the subsidiary gets in a contractual dispute. That doesn't mean the parent gets damages for somebody violating the subsidiary's rights. So why is that analogy wrong here? That analogy is not correct, and let me try to explain why. In this case, assume for the sake of the argument that a company enters into a contract. Amazon, we'll say, is a good example. Amazon enters into a contract with a customer at home to deliver a television set, and because the purchase is more than, I think, $50, the customer has no idea what the freight costs. The customer couldn't care less. It's embedded in the price. Amazon hires UPS to deliver the television set to the customer's house, and the question is, well, who's got the right to seek damages if the customer breaches the contract? The answer is Amazon does, not UPS. UPS doesn't really have any relationship with the customer. Whatever the relationship may be. But Conrail seems to be Amazon in your example. It is not. Not the other two guys. No, the evidence at trial from both Mr. Schaaf and from Ms. Akamazi and the other witnesses who testified as to the damages were pretty clear that the relationship between the two shippers at issue here, Nucor Yamato and SDI, one in Illinois and one in Alabama, the relationship between those shippers was a relationship between the shipper and CSX and Norfolk Southern. They were the ones that issued the way bill. They were the ones that issued the bill of lading. They were the ones that collected the money. They were the ones that earned the revenues, and they then just allocated the cost of Conrail's operations among Conrail, among themselves. That's what they basically did. Conrail has no economic interest in the transaction with the- So you're saying the interference by Grand Trunk, assuming that it occurred, was in connection with these two shipping arrangements that you just mentioned. That's correct. Conrail is sort of incidental to that. Conrail is an incidental player in this game completely. Okay, all right. I got it. But the right you're asserting, is the right allowed under the decision? We believe that our position has been in the district court. Judge Edmonds agreed with us. In this case, she wrote, I counted them, 316 pages of opinions. One of them dealt with this specific question. When she was dealing with it, she found that Decision 89 and the shared asset agreement clearly gave the economic right and contractual standing to CSX and Norfolk Southern to bring a claim for breach of contract, for breach of the trackage rights agreement, and to seek damages. That's what she held before trial. Frankly, at trial, at trial, the Grand Trunk never introduced into the record, in the trial record, the shared asset agreement. They never put Decision 89 before the jury. They never asked any of the witnesses at trial any questions on the standing question. They just didn't, they almost ignored it and said, okay, all of these Conrail operating personnel are available in the Detroit area. What did Grand Trunk do? Nothing. So you're saying the shared asset agreement Mr. Lozier is relying upon is not in the record? It's not in the trial record. It's only available in the summary judgment record when Grand Trunk moved for summary judgment prior to trial. It is not part of the trial record. But he had already won on that. Why would he have? No, he'd lost on it. That's what I mean. You'd already won. I'd won. He'd lost. But if he wanted to preserve that as an issue for this court to consider or for Judge Edmonds to consider under a 50A or 50B motion and renew his objection as to standing, he never did that. He never did that as part of his 50A motion. You're saying to rely upon the 97 agreement he had to get that into the trial record. I believe that's correct, yes, Your Honor. All right. Let me just try to go back just a little bit and set the stage here. This is not a case in which the district court dealt with this matter in a cavalier fashion. As I mentioned a minute ago, Judge Edmonds considered this case. There were 30 pretrial motions filed before her. She wrote 316 pages of opinions. She listened to the very same arguments at the district court that Mr. Lozier has included, Grant Trunk has included in his brief here. And the reality is that Grant Trunk simply disagrees with both the district court's decision, it disagrees with the jury's unanimous verdict, it disagrees with the district court's disposition of the post-trial motions, and it tries by a lot of sleight of hand and a lot of citing snippets of cases to create an impression that is not correct, which is the negotiators of this contract, Mr. Carey on behalf of Conrail and Mr. Cornu on behalf of Conrail, and the lead negotiator from Grant Trunk, David Wilson, were unanimous in their view that this contract meant that Conrail had the right to serve the entire property. And the only evidence, the only evidence in the record, to the contrary, is that from Mr. Ledoux, who is Grant Trunk's current employee, and the person who was involved in the trackage rights agreement. The fascinating part of this morning is that, I don't know, we're in the 28th minute or whatever it is, only now are we getting to what is the 1996 trackage rights agreement. So, the big enchilada here apparently is, what does Trenton Steel Warehouse mean? Trenton Steel Warehouse or its successor. And I would note, I'm the first one to mention those three words this morning. So, you say, one, it's ambiguous. Correct. Two, parole evidence was properly admitted. Under the gross point case, that's correct. And three, when you talk to the people that actually drafted it, they say it was to give access to the whole parcel just as if your client owned the tracks. One hundred percent correct. Is that it? Or built our own tracks. He's going to stand up and he's going to say why that's wrong in a minute. So, anything you want to add on those things? Yes. I've got a question. I'm sorry. Maybe as you're adding. If originally, sorry, Conrail had the straight tracks, right, originally? Way back in 1897 and at the time of the original historical agreements here, there were two north-south tracks that ran along the river in the vicinity of Trenton, Michigan. Okay. And at that point, and then permitted the predecessors to cross. Okay. Both to cross and to wall them in. Okay. And Conrail reserved the right at that time to get across the Grand Trunks tracks. Okay, just one second. Okay, sorry. If they had never crossed the tracks, would Conrail have access to this property? Conrail has the right to access the property by building a line directly across the Grand Trunks tracks from its two tracks in the center of the property. That was a right that Grand Trunk disputed and that was conclusively resolved in the 1996 arbitration. Okay, so Conrail's got the right to build across. What happened, as the record reflects, that the jury had the evidence before it, is that Mr. Wilson, on behalf of the Grand Trunk, Mr. Carey, on behalf of Conrail, said, look, it's expensive for both of us for you to build your own tracks to get across the property to reach this 85-acre parcel. It's going to cause Grand Trunk a lot of extra expense in terms of maintenance. So why don't we make an agreement between ourselves, Conrail, if you, Conrail, prevail in the arbitration and establish that you've got the right to cross the tracks, we'll let you use ours, as if you had built your own. That was the deal the parties made. The Trackage Rights Agreement implements that agreement because Conrail was successful in the arbitration. The arbitrators ruled that Conrail had the right to cross. At trial, we presented evidence from the negotiators of the contract as to what we could do, what Conrail could do, and what Norfolk Southern and CSX could do, once they got across the Grand Trunk tracks. And, you know, the Grand Trunk had a variety of positions. They said, first, oh, you can only reach a single building. And then we asked Mr. Ledoux on cross-examination, well, if the building burns down, can we reach a replacement building? Of course you can. Okay, so it's not the building, you know, as such. Then they said, well, it's the customer. And, well, the problem is the Trenton Steel Warehouse, that term that you ask about, Judge McKeague, there's no such customer known as Trenton Steel Warehouse. The evidence at trial showed that the customer was known as Trenton Steel Storage and Processing, doing business as. Could I ask this question? Once the Conrail trains have gotten across Grand Trunk's tracks, either by building them and getting across or by using Grand Trunk's lines, what business is it of anybody's except Conrail's what happens after that? In our view, none. Yeah, because the agreement was how you get from over here to over there. Exactly, and if you look at Exhibit A to the trackage rights agreement on which Grand Trunk relies so heavily, what they say is, well, this governs because it shows a little schematic of a building. Then what's the purpose of any restriction? There is no restriction on Conrail once it gets onto the private property. But what is the purpose of limiting the purpose for crossing the track? From Grand Trunk's perspective? Why would the agreement have any limiting language at all? We don't believe the agreement has any limiting language other than it prohibits Conrail originally from serving other customers that are along the trackage. That is, along the access right that Grand Trunk granted. And there happened to have been at the time, the record showed at trial, one customer that was existing along the trackage, and that's because Grand Trunk wanted to keep that customer. We have to assume so. There's nothing really in the record, Judge Daughtry, that would Well, it just makes sense. It does make sense. We're going to let you go across our tracks, but we don't want you stealing any of our customers once you get over there. Once you get on private property, we repeatedly said at trial, once you're on the private property, the 85-acre parcel, you can build whatever track, the customers can build whatever tracks they want. Conrail's got the right to run around any private tracks on the 85-acre parcel. So what were they excluding? What Grand Trunk says is that the access was only to serve one entity. That's what they said throughout this case and throughout trial. It wasn't just one entity. It was one building, in effect. At one point, they said a building. Judge Edmonds asked the lawyer for Grand Trunk at summary judgment, Do you really mean a building? Is that what you're saying? Your own witness said it meant a customer. Okay, well, it's a building or a customer. It doesn't really matter. So their position was it didn't really matter whether it was a building or a customer, but they insisted on taking the view that they had the right to restrict what happens on private property. Let me ask you a different question. I'm sorry. What do you say the restriction You started to say, what was the purpose of the restriction? They restricted them. They couldn't just cross the tracks and do whatever they wanted. They restricted it to the Trenton Warehouse. I don't believe that's correct, Your Honor. What did it mean? I'm asking what is your version of what that meant? When the parties used the phrase Trenton Steel Warehouse or its successor, as we said in our brief and as we said throughout the proceedings and argued to the jury and argued to the court in connection with her Rule 52 findings, we always took the same position, which is Trenton Steel Warehouse or its successor was a shorthand way of saying the property. Okay, but what does that exclude? It doesn't exclude anything. But then why did you have I'm asking you why when they negotiated this did they limit the right to cross? What was the purpose of that limitation and what did it apply to? You started to say something about another customer. There was another customer along the trackage called E.C. Levy. Okay, and where was E.C. Let me see if I can help. So if you're going to use their tracks, the restriction was you couldn't pick up their customers on the way to this parcel. Now, similarly, I assume it's theoretically possible to continue these tracks on past this parcel. In theory, that would be possible. And you couldn't do that either, right? You could use their tracks only to get to this parcel, whatever that meant. I believe that's correct. Okay, why? Why would the parties have limited it to one parcel? No. Why? I'm sort of curious about All right. You were crossing their tracks. That's correct. And that was the issue, right? The original issue was could we cross? That was resolved in Conrail's favor now for the benefit of Norfolk Southern and CSX. Okay. You have the right to cross. Tell me why once you cross, why would you not be able to go beyond that property? And why, to get to this other company that existed, how would you get there? Whose track would you use? The other company is located on a switch. If you look at, I forget which exhibit it is. It might be 521 on the record, but there's an aerial photograph. My colleague can help me if I got the wrong number. But there's a customer called E.C. Levy who's got a switch that is located along the blue part of the trackage rights route, which is exhibit A to the trackage rights agreement. We clearly understood that Conrail, Norfolk Southern, and CSX could not serve E.C. Levy because they were located along the trackage, and the agreement clearly says along the trackage. Whose trackage? Along Grand Trunks trackage. Along the trackage that crossed. Right, so we couldn't use Grand Trunks tracks for that purpose. Once we got on... Am I not right that you acceded to some restrictions in return for not having to spend the dough to build the crossing? That's actually a fair question, except the evidence at trial wasn't really that. The evidence at trial was that the cost of construction was not the real issue. The real issue was that Grand Trunk would have been required to pay for the ongoing maintenance of Conrail's crossing because that's the way the railroad ended. So you were willing to alleviate that, help them alleviate that, in return for some restrictions. Correct. That's why you did it. But when you used the phrase restrictions, Judge McKeegan... Restriction was in the original, 1897 or whatever. Isn't that the one that said you could cross the tracks in order to get to the warehouse? That said you could cross the tracks, period, the 1897 agreement. We could cross generally. When they came to implement it in 1996, I think in response to your question, I think I now understand it, Judge White, the party said, look, we're going to let you cross the tracks, but we're going to only let you serve the 85-acre parcel. That was the restriction to which Conrail agreed. So I think in response to your question, Judge McKeegan, if the Ford Motor Company had built a plant one mile down the road on an adjacent piece of property and they were going to have 100,000 carloads a year, you can understand why Grand Trunk might not have been that excited about letting Conrail use this piece of trackage to move 100,000 carloads a year on some other parcel. So you would have had to go further down the trackage and build your own crossing, cross over, and then you could serve that additional parcel? Correct. You just didn't get it in this deal? That's correct. Okay. All right. All set? Thank you. All right. Mr. Lozier? Your Honor, I have three points that I want to make with respect to this trackage rights agreement. First off, and I'm going to skip past some of the other comments concerning whether we preserved or didn't preserve by way of evidence the other question that was raised in terms of the issue of Norfolk Southern stepping into the shoes of Conrail and being able to sue. There's a case directly I'm pointing out, our brief on page 36, that says we do have that right. It was already resolved, as Judge White noted. In addition, I want to address immediately Judge Doherty's assumption, I think, at least the impression I'm getting. Well, going back and looking, I think you mean about the 1897? No, no. The 1897 and all the rest of it, in fact, the evidence that was introduced was limited and the judge specifically directed it be limited. But putting all that aside, what I want to get to is this. When you go back and you look at Section 1 and you determine what restrictions are put on there, there are restrictions for along the track that went to, that I should say the track, Grand Trunks Track, that led into the industrial track of Huron Valley Steel Company, which allowed service to be made. But these restrictions in every one of these witnesses, including Wilson, Carey, and Ledoux, all testified this was a unique type of a trackage rights agreement. And because of its uniqueness, there was an additional restriction. And the restriction, if you look at and write in Section 1, that restriction is, and people seem to go past it, including the district court judge, it says, subject to the terms and conditions herein provided, GTW hereby grants to Conrail the right to operate its trains, locomotives, cars, and equipment with its own crews hereinafter referred to as trackage rights in either direction over the following segments of GTW's railroad for the sole purpose of serving Trenton Steel Warehouse or its successor, hereinafter industry, shown on the plan attached here to and made a part hereof. I don't think that's any different than what Mr. Schickman has said. They agreed that they weren't going to be able to pick up customers on the way to that site, and they couldn't go past it. No, that's an additional restriction because it's a purpose restriction. And the purpose restriction applies to, that's one that's an additional restriction that limits even using the track for the purpose of serving anyone else, even when you get on to the track of Huron Valley Steel. Only if you win in the interpretation of what Trenton Steel Warehouse means. And I'll get to that right now. Why isn't this the successor? Didn't they sell part of their property? It's not a successor, and that's a very good point, Your Honor. It's not a successor because when you look at the common terms that are used in the commercial transactions, and as defined by Blacks even, a law dictionary, a successor is an entity, a corporation, that succeeds to another corporation. There is no cases, and I don't believe they cited any cases, that suggest that you can have a successor to property or a geographic area. So this 85 land mass isn't subject to successor. Well, excuse me, but there is this new business that's on this 85-acre property. Who can take construction materials in there? Our client, Grand Trunk Western, because it had the right to do that in terms of its agrarian property. Well, does it have tracks through the middle of the 85 acres that would allow it to arrive? It had tracks that led into the HBC industrial track, and that would allow it to arrive into the other entity. Just out of curiosity, Mr. Lozier, assuming that you were right and they wanted to serve the other portions of this 85 acres, they still have the right to cross your tracks and to construct their own tracks to get to the rest of the 85 acres in any event, do they not? I don't believe that they do. Why not under the 1897 crossing? Because it's not, Your Honor, and I don't know why I'm not making this clear, but it's not the right to get to the end of and to service the rest of that property. What it has to do, the restriction is you can't use our tracks to go over for the purpose of serving anyone else. I got that. That's what I'm saying. You're not understanding my question because I'm not being clear enough. Let's assume that you're, I'm just curious what happens in the future, because even if you're right that this agreement says you can only use, they can only use your tracks to get to that one portion of the parcel, you don't dispute that, right? The question is the warehouse. They can use our tracks to get to the Trenton Steel warehouse, not to the portion. That's what their argument is, and we disagree with that. You say they can only get to the former part of the parcel. I'm not seeing that very articulately. My point, what I'm asking you is, even assuming you're right about that, there is a way that they could serve this new business. There is, and I can respond to that. They would have to then utilize the crossing agreement, build their own track, not use yours to get to the other portion of the parcel. I would disagree with that, Your Honor. Why? Because that falls right into the landmass interpretation again, that, in fact, they can use our track to get to that parcel of property, and they can't. They can only use. You would read your agreement as having also foreclosed them doing that in the future. On our track. They can go forward and go to either agree with us. That's what I said, build their own track. I'm not talking about using your track. Well, you're saying that they would use our track up to the property, and I'm saying they can't use our track. Right, I got that. I got that. Okay. But they can go to the STB. We understand each other. But they can invoke the crossing agreement again. No, not for that purpose. Go back to arbitration. Because in terms of going forward on that basis, they are already restricted in terms of the TRA is what I'm suggesting, Your Honor, if that's what you're talking about. I got us into something. I have one other. Your time's up. Thank you. It's an interesting question. We've studied the briefs carefully, so you're not missing telling us anything. The case will be submitted, and you may adjourn the court.